IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA, ex rel.**
**LOUANNE BOOTHE,**

      **Plaintiffs,**

v.                                                                       **CIV 03-1276 RB/DJS**

**SUN HEALTHCARE GROUP, INC.,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

Plaintiff Louanne Booth filed a *qui tam* action under the Federal Claims Act ("FCA") against her former employer, Defendant Sun Healthcare Group, Inc. ("Sun"), alleging that it overbilled the United States for Medicare and Medicaid services in ten different ways. I dismissed the action for lack of subject matter jurisdiction finding Plaintiff was not the "original source" for the public disclosure of wrongdoing and, thus, did not address the other three grounds for dismissal Defendant had raised. The Tenth Circuit affirmed on that basis for three of the ten allegations, but reversed and remanded for an individual determination of the other seven claims. *See U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.,* 2006 WL 4748673 (D.N.M 2006), *aff'd in part and rev'd in part,* 496 F.3d 1169, 1177 (10th Cir. 2007). After remand, I directed Defendant to file a "motion for summary judgment" on the remaining seven claims and the unaddressed three grounds for dismissal. *Doc. 36, see also Doc. 37.* Having considered the submissions of counsel, relevant law, and being otherwise fully advised, I deny the motion.

**I.    Standard.**

This case is not in the posture contemplated by the Tenth Circuit in its remand since Sun

no longer challenges the remaining seven allegations on the ground that they are based on prior public disclosures. *See Doc. 39* at 2. Instead, it re-raises the three grounds that have not yet been addressed. Also, despite the fact that I specifically directed Sun to file a motion for summary judgment under Federal Rule 56, Sun again cites Federal Rule 12 as the basis for dismissal. *See Docs. 36-37; see also Doc. 39* at 1. That is, it first moves to dismiss the Complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), arguing that Plaintiff waived her FCA claims in a separation agreement terminating her employ. Alternatively, it moves to dismiss the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), arguing that most of Plaintiff's allegations are governed by the document discharging Defendant's Chapter 11 bankruptcy and, in any event, her allegations are not pled with sufficient particularity to satisfy Fed. R. Civ. P. 9(b). *See Docs. 37, 39.*

In my pre-appeal decision, I converted the matter to a summary judgment posture and gave notice of my intent to do so. *See Doc. 28.* I recognize that it is inappropriate to consider matters outside the pleadings in a motion for dismissal under Rule 12(b)(6) without notice of the conversion. *E.g., Alvarado v. KOB-TV, L.L.C.,* 493 F.3d 1210, 1215 (10th Cir. 2007). Nevertheless, I consider the matter before me in a summary judgment posture without having to provide further notice or delay the matter further.

First, the Tenth Circuit has already characterized the claims as "non-jurisdictional," and I consider myself and the parties bound by that characterization. Thus, Rule 12(b)(1) standards are inapplicable at this juncture.[1] Moreover, I specifically ordered Defendant to file a motion in that

---

[1] Though lack of standing and discharge in bankruptcy have been characterized as Rule 12(b)(1) jurisdictional defenses, the Tenth Circuit expressly characterized the arguments as "non-jurisdictional." *See Boothe,* 496 F.3d at 1177 & n.7 ("Sun's alternative, non-jurisdictional arguments for dismissal on which the district court has yet to pass," citing footnote 1 at page 1172 that recited the waiver, discharge, and particularity arguments); *compare Colo. Envtl. Coal. v. Wenker,* 353 F.3d 1221, 1227 (10th Cir. 2004) ("We choose to treat this appeal as seeking

posture, and Plaintiff was aware of that order. And, in support of the waiver and discharge claims, Defendant attached pertinent portions of the agreement and bankruptcy documents. *See Doc. 39,* Exhs. A-C; *Doc. 42,* Exhs. A-B. When documents outside the pleadings are attached to a motion styled as a motion to dismiss, the immediate question is whether or not to treat the motion as one for summary judgment under Rule 56. Yet, Plaintiff does not object to consideration of the exhibits or suggest that their terms are in dispute. Indeed, in this round of briefing, Plaintiff incorporates an affidavit she filed in pre-appeal briefing. *See Doc. 40* at 6. *See Marquez v. Cable One, Inc.,* 463 F.3d 1118, 1121 (10th Cir. 2006) (plaintiff had adequate notice of summary judgment posture); *see also Doc. 40.*

The briefs are particularly well-written and the parties are familiar with the background and law. Furthermore, none of the relevant facts are in dispute. Therefore, I will be somewhat brief. After determining the proper standard of review, I find it easiest to discuss the claims in reverse order to the way they were presented.

## II.     Plaintiff's allegations are sufficiently particular and, even if not, amendment would be permitted.

Plaintiff's affidavit states that she was employed by Sun "from September 2, 1997 until January 27, 2003," in various positions, but ending as "Chief Financial Officer of Continental Rehabilitation Hospital and Ballard Rehabilitation Hospital." *Doc. 21,* Exh. 2, ¶ 1. Her duties

---

review of a Rule 12(b)(1) dismissal because the two grounds cited by the district court-that the plaintiffs lacked standing and that the statute they sued under does not permit judicial review-are jurisdictional."), *and United States v. Rodriguez-Aguirre,* 264 F.3d 1195, 1202 n.5 (10th Cir. 2001) ("Although the motion to dismiss did not specify the Rule of Civil Procedure under which dismissal was sought, we assume it was Rule 12(b)(1) regarding the standing argument"); *and Morelli v. Serv. America Dining Servs.,* 1998 WL 166878 at * 2 (N.D.N.Y. 1998) ("The Court will first address Defendant Service America's motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(1). Defendant alleges that Plaintiff's claims were discharged in Bankruptcy because, even though on notice of the pending bankruptcy, Plaintiff failed to file a proof of claim with the Bankruptcy Court. Plaintiff argues that her claim was not dischargeable in the bankruptcy proceedings.").

"included handling all accounting and payroll matters, accounts payable, and all other financial matters." *Id.,* ¶ 9. While employed, she discussed with Sun's "Compliance Officer Chauncy Hunker all of the allegations contained in" her FCA complaint and he "assured [her] that the problems would be remedied," but Plaintiff "later learned that no remediation occurred." *Id.,* ¶ 10.

Rule 9(b) requires that fraud be "stated with particularity" and it applies "to actions under the FCA." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,* 472 F.3d 702, 726 (10th Cir. 2006). "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud . . . and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Id.,* 472 F.3d at 726-27 (internal quotations and citations omitted). Review under Rule 9(b) is based on the "text of the complaint." *Id.*, 472 F.3d at 726. The paragraphs of the Complaint that encompass Plaintiff's remaining seven claims are as follows:

[First Remaining Claim[2]]:
11. In 2002, Sun overcharged Medicare $240,000 for pharmacy charges at Northview Psychiatric Hospital in Boise, Idaho.

[Second Remaining Claim[3]]:
12. In 2001, $200,000 worth of medical supplies were stolen by the central supply clerk at Denver Mediplex Specialty Hospital in Denver, Colorado.
13. Sun fraudulently billed Medicare $200,000 for the supplies stolen by the central supply clerk at Denver Mediplex Specialty Hospital as though patients had used the supplies, and Medicare paid for them.

[Third Remaining Claim[4]]:
15. In 2000, 2001, and 2002, at Denver Mediplex Specialty Hospital, Sun overcharged Medicare $540,000 when it funneled costs from the outpatient clinic

---

[2] Originally designated as Claim #3 in this Court's prior opinion. *See Boothe,* 2006 WL at *1.

[3] Originally designated as Claim #4 in this Court's prior opinion. *See id.*

[4] Originally designated as Claim #6 in this Court's prior opinion. *See id.*

owned by SunDance into the hospital cost reports for Medicare Reimbursement.

[Fourth Remaining Claim[5]]:
16. When Sun filed for bankruptcy in October 1999, it stopped paying its mortgage on the Denver Mediplex Specialty Hospital, but it continued to file cost reports to Medicare for reimbursement for its interest payments, which it did not make, resulting in cost report overstatements of $3.6 million in 2000, 2001, and 2002.

[Fifth Remaining Claim[6]]:
17. On July 1, 2002, Sun's Ballard Rehabilitation Hospital in San Bernardino, California converted from cost-based billing to flat-rate billing.
18. To increase revenues after switching to flat-rate billing, Ballard Rehabilitation Hospital began discharging patients earlier than before.
19. The early-discharge policy at Ballard Rehabilitation Hospital resulted in an increase in Medicare revenue from $800 per day in June 2002 to $1,000 per day after July 1, 2002, which increased the hospital's Medicare revenue by $2 million.

[Sixth Remaining Claim[7]]:
20. Continental Rehabilitation Hospital in San Diego, California converted from cost-based billing to per-diem billing.
21. Long-term acute care hospitals received a higher per-diem reimbursement; Continental Rehabilitation Hospital converted to long-term acute care in March of 2002.
22. In order to convert to long-term acute care, the administration at Continental Rehabilitation Hospital and the hospital's physicians manipulated patients' discharges so that average length of stay would be twenty-five days, which is required in order to obtain a long-term acute care status.
23. The manipulation of lengths of stays at Continental Rehabilitation Hospital resulted in an increased cost to Medicare of approximately $500,000.

[Seventh Remaining Claim[8]]:
24. In January 2003, Plaintiff noticed that approx 30% of Sun's Medicare admissions were the result of accidents or injuries and determined that Medicare was being charged when third party payers should have been charged.
25. In January 2003, Plaintiff also discovered that the Medicare forms indicating that the injury was not the result of an accident were not being filled out by the

---

[5] Originally designated as Claim #7 in this Court's prior opinion. *See id.* at *2.

[6] Originally designated as Claim #8 in this Court's prior opinion. *See id.*

[7] Originally designated as Claim #9 in this Court's prior opinion. *See id.*

[8] Originally designated at Claim #10 in this Court's prior opinion. *See id.*

patients, as they should have been, but they were actually filled out and sent to Medicare by Sun's hospital admissions personnel after the patient had signed the blank forms.
26.  The three-year fraud offense described in ¶¶ 24-25 resulted in an estimated $9.0 million over-billing to Medicare.

*Doc. 1.*

All of the allegations center around Sun's alleged overbilling practices and describe what was overcharged, the year or years when the overbilling practice occurred, how much was overcharged, and the circumstances that led to the overbilling. I find that they satisfy the minimum requirements under Rule 9(b) because they provide more detail than allegations the Tenth Circuit has found wanting. For example, at the far end of the conclusory/particularity spectrum, the Tenth Circuit recently observed and held:

> According to Told, the following paragraph in his complaint set forth his additional FCA claim with the particularity required:
>
>> Upon information and [b]elief, these defendants almost certainly have committed these same kinds of violations of the False Claims Act in connection with all other projects that they have been engaged which were funded in any way by Federal funds; and have violated said False Claims Act in connection with all said projects up through the filing of this complaint and through the date of trial.
>
> As we see it, this statement, when considered together with the remainder of the complaint, 'falls woefully short of adequately pleading' an FCA violation in relation to the claim Told now attempts to put forth. *See* [*Sikkenga,* 472 F.3d] at 727. Although we read the complaint to generally set forth the 'who,' and perhaps the 'what,' of the additional claim, that pleading clearly fails to allege well-pleaded facts related to the 'when,' 'where,' and 'how' of the purported FCA violation.

*U.S. ex rel. Told v. Interwest Const. Co., Inc.,* 2008 WL 598120 at *2-3 (10th Cir. 2008).

Moreover, the Tenth Circuit and District of New Mexico decisions cited by Defendant do not hold to the contrary, and are readily distinguishable. The allegations in *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1236 (10th Cir. 2000) and *United States v. Cheng,* 184 F.R.D. 399, 402

6

(D.N.M. 1988), for example, also fall at the far end of the conclusory/particularity spectrum.  The single paragraph of the complaint at issue in *Koch* stated:

> during 1982 and continuing to the present time, defendants planned and acted to conceal the true value of shares of stock in Koch Industries from plaintiffs and the other selling shareholders and carried out a scheme designed to understate the existence, extent and value of property and assets owned directly or beneficially by Koch Industries by failing to disclose the existence, location, ownership, condition and true value of assets and property, including, but not limited to, oil and gas reserves, acreage, prospects and properties, oil and gas production and planned development of oil and gas properties owned or acquired prior to June 10, 1983.

*Koch,* 203 F.3d at 1236.

> Likewise, in the single paragraph of the complaint at issue in *Cheng:*
>
> the sum total of the information alleged in the Complaint regarding the purported fraud is the statement that Dr. Cheng "submitted fraudulent leave slips or failed to submit leave slips for hours he was absent from his duty station and still received a pay check." Complaint ¶ 9.  The Court can hardly imagine a more "conclusory" allegation of fraud. The Government has failed to provide even a vague description of the content of the fraudulent statements and has provided no grounds from which this Court might infer what about those statements is false.  What does it mean to "submit fraudulent leave slips"?  Did Dr. Cheng affirmatively state that he was entitled to leave when he was not?  Did Dr. Cheng affirmatively state that he was at work hours when he was not? Or, did Dr. Cheng simply fail to request all of the time off which he took, and how would this failure translate into a false statement?  What did Dr. Cheng say, when did he say it, and how was it false?  The Complaint does not provide the Court with any basis for answering these questions.

*Cheng*, 184 F.R.D. at 402.

The *Sikkenga* decision must be read in light of its particular facts.  The decision counsels that particularity is required so that the allegations make the link between the "underlying scheme" or "other wrongful activity," and the fraudulent claim submitted to the Government for payment. *Sikkenga*, 472 F.3d at 727.  The allegations in *Sikkenga* were tentative and speculative.  There, the plaintiff alleged manipulation of "CPEP score reductions" and processing resubmitted claims "as adjustments rather than as reviews."  *Id.*, 472 F.3d at 726.  The theory was that these machinations

7

resulted in: (1) the defendant being paid for "administrative costs as though conforming services had been provided," and (2) the defendant's Medicare contract was renewed when it otherwise would have been terminated. *Id.*

*Sikkenga*, however, did not allege "the specifics of any actual claims submitted" or "any false certifications." *Id.*, 472 F.3d at 728. This ran afoul of the Tenth Circuit's agreement with the Eleventh Circuit that an FCA Plaintiff cannot " 'merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government.' " *Sikkenga*, 472 F.3d at 722 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir.2002)). The Tenth Circuit further agreed that the "alleged misrepresentations to a possible contract termination is attenuated." *Id.*, 472 F.3d at 728.

In contrast to *Sikkenga,* here, Plaintiff's allegations are straightforward and the link between the conduct and the bill is direct – Sun billed more than it should have for pharmacy services; Sun charged for stolen items; Sun charged for costs incurred by someone else; Sun instituted an early discharge policy so that it could, and did, charge the Government more money; Sun and its physicians manipulated when patients were discharged so that it could, and did, bill for long-term acute care rather than a lower rate; and Sun billed the Government for accidents or injuries that should have been paid by a third party.

I reject Sun's suggestion that Plaintiff needs to provide, in minute detail, everything about every single bill that was submitted to the Government pursuant to these practices. First, Plaintiff set out the years that the practices occurred and the estimated cost of the overbilling during that time period. All in all, she claims that, as a result of all these practices, the "United States has suffered damages of approximately $29.88 million." *Doc. 1,* ¶ 27. I would submit that requiring minute

detail on all the bills that add up to this figure to be listed by Plaintiff in her Complaint prior to discovery imposes an impossible burden.

Second, to support this level of detail, Sun relies on a Tenth Circuit quote from a First Circuit case that lists the sorts of details an FCA claim should contain. *See Doc. 39* at 17 (quote without attribution). However, these details are not different in kind from the who/what/when/where/how "minimum requirements" identified by the Tenth Circuit. Furthermore, the quote specifically states that these details "do not constitute a checklist of mandatory requirements that must be satisfied for each allegation in a complaint," only "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Sikkenga,* 472 F.3d at 727-28 (internal quotations and citations omitted).

Finally, even if I found the allegations insufficient, I would not grant dismissal as the remedy, but would permit amendment as Plaintiff requests in the alternative. *See Doc. 40* at 15. Though this case has been pending for years, it has not progressed far. Almost the first two years of the suit were devoted to the United States evaluating whether to intervene. *See Doc. 17.* After it declined, dispositive motions were filed immediately and the appeal ensued thereafter. That period took another two years. *See Docs. 19-34.* To date, no discovery has been undertaken. I find it inappropriate to dismiss for lack of particularity under those circumstances without permitting amendment where, as here, there has been no prior amendment and the allegations in the Complaint are sufficient or at least fall on the particularity end of the spectrum.

> "[W]e cannot say that the district court abused its discretion in disallowing this additional claim, particularly considering that discovery was already complete and the court had a fully submitted motion for summary judgment before it. "Courts typically find prejudice . . . when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment. Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Minter v. Prime Equip. Co.,* 451

> F.3d 1196, 1208 (10th Cir. 2006) (citation and quotation omitted). Although Told's belated claim purportedly arose under the FCA, it involved entirely different facts (i.e., the settlement agreement between the government and Interwest). As the district court recognized, requiring Interwest to defend against this claim late in the proceedings would "place a serious burden on Interwest, effectively putting the parties back at square one."

*Told* at 2008 WL at *3; *see also, e.g., Sikkenga,* 472 F.2d at 707 n.5 ("the district court allowed Sikkenga to amend her complaint to cure failing in the allegations under . . . Federal Rule of Civil Procedure 9(b).").

### III. Plaintiff's pre-2/28/02 allegations fall within the scope of Sun's bankruptcy discharge.

A short chronological background is in order to discuss this next claim. Plaintiff worked for Sun from 1997 to 2003. She was not the only "*qui tam* Plaintiff to finger Sun for fraud" [since] between October 1996 and June 1999 . . . other Plaintiffs filed no fewer than eleven other *qui tam* complaints against Sun." *Boothe,* 496 F.3d at 1171. However, Plaintiff did not act until after her termination. In the interim, Defendant "and approximately 185 of its affiliates" had filed their 1999 petition for Chapter 11 bankruptcy, had been granted a discharge effective February 28, 2002, and the United States had settled the then-pending *qui tam* suits. *E.g., Boothe,* 496 F.3d at 1172; *In Re Sun Healthcare Group, Inc.,* 245 B.R. 779, 781 (Bkrtcy. D. Del. 2000), *aff'd,* 2002 WL 31155179 (D. Del. 2002); *Doc. 42-3* at 1 ("The effective date of the plan occurred on February 28, 2002 (the 'Effective Date')." Although Plaintiff was aware of the bankruptcy proceedings, she avers that she was not aware until years after filing suit that other *qui tam* actions had been pending, and that at the time her employ was terminated, she had not informed the United States about her suspicions, did not anticipate filing a *qui tam* suit against Sun, and the United States was unaware of the agreement she signed with Sun. *See Doc. 21,* Exh. 2, ¶¶ 3-4, 8, 14.

Sun argues that some of Plaintiff's claims will be subject to the discharge entered by the

10

bankruptcy court and Plaintiff argues that *qui tam* claims are excepted under the terms of the discharge. Having obtained full copies of the pertinent documents from the United States Bankruptcy Court for the District of Delaware and having read them in their entirety, I agree with Sun's construction.

Sun's reorganization plan defined the claims it covered and, because there were *qui tam* proceedings pending against it in eight states,[9] the plan specifically mentions those sorts of claims, calling them "United States Health Care Program" claims. *See In re Sun Healthcare Group, Inc., et al.,* 99-3657 (MFW) (Doc. 6543, filed 12/19/2001, ¶¶ 1.57, 4.3, 5.12). Those claims were covered in a separate agreement, submitted as a "supplement" to the original plan. While the United States agreed to "release Sun . . from" and agreed to "refraining from instituting, directing, or maintaining any action against Sun for any civil or administrative monetary claim the United States has or may have under the False Claims Act," it specifically and ***expressly refused*** to release any individuals – "No individuals are released by this Settlement Agreement. The United States released only the federal portion of claims regarding Medicaid." *Id.* (Doc. 6717, Attachment A, ¶ IV.C.6 at page 25-26). The Plaintiffs, who were specifically named in the agreement, separately released Sun. *See id.,* ¶¶ II.C - II.M, IV.C.9.

The Confirmation Order expressly incorporated the "supplement" and the terms of the Confirmation Order are expressly binding on "any holder of a claim against . . the Debtors . . . whether or not the Claim . . . is impaired under the Plan and whether or not such holder or entity has accepted the Plan." *Id.* (Doc. 7004, ¶ 31 at pages 14-15). Paragraph 49 of the Confirmation Order

---

[9] The states were Arkansas, California, Connecticut, Florida, Georgia, Massachusetts, Pennsylvania, and Texas, but not New Mexico. Cases brought in New Mexico were by investors for securities fraud. *See In re. Sun Healthcare Group, Inc. Securities Litigation,* 214 F.R.D. 671 (D.N.M. 2003); *In re Sun Healthcare Group, Inc. Securities Litigation,* 181 F. Supp. 2d 1283 (D.N.M. 2002).

discharges and terminates claims based on Sun's conduct prior to February 28, 2002 and provides in relevant part:

> the rights afforded in the Plan and the payments and distributions to be made under the Plan shall discharge all existing debts and Claims, and terminate all Equity Interest, of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. . . . all existing Claims . . . shall be, and shall be deemed to be, discharged and terminated and ***the holders of Claims*** and Equity Interest ***shall be precluded*** and enjoined ***from asserting*** against the Reorganized Debtors, or any of their assets or properties, ***any other of or further Claim*** or Equity Interest ***based upon any action or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date [2/28/02], whether or not such holder has filed a proof of claim or a proof of equity interest.***

*Id.,* ¶49 (at pages 25-26) (emphasis added). Paragraph 51 addresses the sorts of claims that are not discharged: "holders of any personal injury, tort or other similar litigation Claim arising on or after the Petition Date shall not be subject to the discharge injunction." *Id.,* ¶ 51 (at page 26); *see also id.* (Doc. 6543, ¶1.56 ("Tort Claims means any claim related to personal injury, property damage, products liability, wrongful death or other similar Claims against any of the Debtors."))

Sun argues in its reply that, because the "discharge of the United State's claims was not limited to the specific claims released in the Settlement agreement," the "bankruptcy discharged" them. *Doc. 42* at 8. In other words, the United States' settlement agreement left open the possibility other *qui tam* claims existed, and thus left them to be covered under the broader terms of the bankruptcy. I agree. Even assuming it could be argued that some confusion resulted by dealing with *qui tam* claims in a separate definition section and separate agreement, "any inconsistency between the provision of the Plan and [the] Confirmation Order" are "governed" by the Confirmation Order and, thus, by the broad definition of claimholders and claims released. *In re Sun Healthcare Group, Inc., et al.,* 99-3657 (MFW) (Doc. 7004, ¶ 67 at page 32).

Sun also correctly asserts that *qui tam* claims are not tort claims and, therefore, do not fall

12

within the "postpetition tort claims" exception to the discharge.

> The primary purpose of the FCA claim is to ensure that the United States gains restitution of money fraudulently obtained from it. Thus, the underlying cause of action that gives rise to the taxpayer's Plaintiff's award is based upon contract fraud, not a tort.
>
> Not only is the underlying cause of action not based upon tort or tort type rights, but it also does not compensate the taxpayer for an injury inflicted upon him. Rather, the FCA permits a *qui tam* plaintiff to bring a suit in the name of the United States for contract fraud committed against it. 31 U.S.C. § 3730(b)(1). The Supreme Court's decision, in *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765 (2000), highlights the fact that the injury that is redressed in a qui tam action under the FCA is an injury to the government .

*Brooks v. United States,* 383 F.3d 521, 524-25 (6th Cir. 2004).

Thus, any claim that is based on conduct that occurred prior to February 28, 2002 is not actionable because it falls within the scope of the discharge in bankruptcy. Accordingly, the second remaining claim, based solely on conduct in 2001, will be dismissed. The other remaining claims that contain allegations of conduct occurring in 2002 appear directed at conduct engaged in throughout 2002, and thus after the effective date, but that will need to be clarified at a later date.

### IV.    The waiver/release of Plaintiff's FCA claims is unenforceable.

When Plaintiff's employ terminated, she signed an agreement with Sun that contains a release worded broadly enough to waive an FCA claim. *See, e.g., Doc. 39-2* at 1, ¶ 1 ("This waiver does not prevent Employee from participating in any investigation of a charge conducted by any government agency. Employee nevertheless understands and agrees that, because of the waiver and release she freely provided by signing this Release, she cannot obtain any monetary relief or recover from any such proceedings, including costs and attorneys' fees."). Whether a waiver of FCA rights will be enforced is a separate issue.

Sun argues that the Supreme Court opinions, in *Town of Newton v. Rummery,* 480 U.S. 386

(1987) and *United States v. Mezzanatto,* 513 U.S. 196 (1995), compel the conclusion that a waiver of FCA claims must be enforced. I do not read either case as directing that result. Neither involved a waiver of FCA rights. In terms of the question before me, they simply stand for the proposition that rights can be waived. The parties have not cited, nor have I found, any Supreme Court or Tenth Circuit decision addressing the issue of waiver in the FCA context.

I am persuaded by the authorities, including Districts in this Circuit, that hold these waivers unenforceable when the United States has no knowledge of this potential plaintiff's allegations of fraud or the release, and does not affirmatively consent to the release. Plaintiff's affidavit asserts that these are the circumstances surrounding her release – a contention not challenged by Sun. *See, e.g., Doc. 21,* Exh. 2; *Doc. 39* at 4-5; *Doc. 42* at 2-3; *see also, e.g., United States v. Teledyne Wah Chang Albany,* 104 F.3d 230, 231 (9th Cir. 1997) (and authorities cited therein); *United States ex rel. Longhi v. Lithium Power Tech., Inc.,* 481 F. Supp. 2d 815, 818-23 (S.D. Tex. 2007) (same); *United States ex. rel. Bahrani v. Conagra, Inc.,* 183 F. Supp. 2d 1272, 1278 (D. Colo. 2002) (same); *United States ex rel. El-Amin v. George Washington Univ.,* 2007 WL 1302597 at 3-8 (D. D.C. 2007) (same).

**WHEREFORE,**

**IT IS ORDERED** that Defendant's "motion for summary judgment" (Doc. 37, filed on October 5, 2007) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that remaining Claim 2 is **DISMISSED**;

**IT IS FINALLY ORDERED** that, given the length of time that the proceedings have been pending, the Magistrate Judge hold a settlement conference as soon as practicable.

						_____
						**ROBERT C. BRACK**
						**UNITED STATES DISTRICT JUDGE**